**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES,** | : | **CRIMINAL NO. 1:10-CR-0330** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **ALCIDE FRAGUELA-CASANOVA** | : | |
| **and JUAN CARLOS ALMAGUER** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the court is a motion (Doc. 61) to suppress evidence filed by defendants Alcide Fraguela-Casanova ("Fraguela") and Juan Carlos Almaguer ("Almaguer"). Fraguela and Almaguer contend that Pennsylvania State Police Corporal Manueal DeLeon ("Corporal DeLeon") violated their Fourth Amendments rights by unlawfully seizing them on October 25, 2010. For the following reasons, the court will grant the motion.

## I. Factual Findings[1]

On October 25, 2010, at approximately 11:20 a.m., Corporal DeLeon observed a vehicle driving in reverse on an entrance ramp at the Interstate 81 interchange of the Pennsylvania Turnpike. (Sept. Hr'g Tr. at 5-6). Corporal DeLeon exited his squad car to resolve the traffic hazard and witnessed a tractor-trailer almost collide with the vehicle driving in reverse. (Id. at 6). Corporal DeLeon testified that tractor-

---

[1] These findings are based on evidence presented at the September 1, 2011, and December 13, 2011, evidentiary hearings on the motion. Citations to the September, 1, 2011, hearing transcript are abbreviated throughout as "Sept. Hr'g Tr." Citations to the December 13, 2011, hearing transcript are abbreviated throughout as "Dec. Hr'g Tr." Citations to the video recording of the October 25, 2011, traffic stop (Gov't Ex. 1) are abbreviated throughout as "Vid. R."

trailer's driver did not in any way acknowledge his presence and that he observed a man hunched over in the passenger's seat.[2] (Id. at 6-7). The tractor-trailer entered the Pennsylvania Turnpike traveling eastbound. (Id. at 8).

Corporal DeLeon decided to follow the tractor-trailer. (Id.) Corporal DeLeon witnessed the tractor-trailer improperly change lanes without using its turn signal. (Id.) At approximately 11:25 a.m., Corporal DeLeon activated his lights and sirens and initiated the traffic stop. (Id. at 9); (Vid. R. at 11:25). At 11:26 a.m., Corporal DeLeon approached the tractor-trailer at mile marker 228.4 on the Pennsylvania Turnpike. (Vid. R. at 11:26). The tractor-trailer contained Almaguer, the driver, and Fraguela, the passenger. Corporal DeLeon obtained Almaguer's commercial driver's license, registration, and logbook. (Sept. Hr'g Tr. at 10); (Vid. R. at 11:26). Almaguer appeared to be nervous. (Sept. Hr'g Tr. at 15). Corporal DeLeon directed Almaguer to move the tractor-trailer to wider area of the Pennsylvania Turnpike. (Id. at 10). Almaguer proceeded to mile marker 229.5 on the Pennsylvania Turnpike and pulled over to the shoulder. (Id.) Corporal DeLeon followed Almaguer to mile marker 229.5 and at 11:30 a.m., he re-approached the tractor-trailer. (Id. at 11); (Vid. R. at 11:30). Corporal DeLeon collected additional documents from Almaguer and Fraguela including the bill lading, Almaguer's and Fraguela's medical cards, and Fraguela's commercial driver's license. (Sept. Hr. Tr. at 11). Corporal DeLeon

_____

[2] Corporal DeLeon found this behavior suspicious because the other drivers on the ramp had slowed down to look at the scene of a vehicle driving in reverse in the presence of a police vehicle. (Sept. Hr'g Tr. at 6-7).

engaged Almaguer and Fraguela in conversation and discussed, *inter alia*, the presence of Fraguela, that Fraguela did not have a logbook despite being listed as a secondary driver in Almaguer's logbook,[3] Almaguer's failure to use a turn signal, the bill of lading, and the origin and destination of their trip. (Id. at 12-17). Corporal DeLeon noticed that Fraguela could not converse in English, a requirement for all commercial drivers. (Id. at 14).

At 11:37 a.m., Corporal DeLeon returned to his vehicle and reviewed Almaguer's and Fraguela's documents. (Vid. R. at 11:37). Corporal DeLeon noticed that Almaguer's logbook did not document how he arrived in Kentucky, where Almaguer claimed to have picked up the trailer. (Sept. Hr'g Tr. at 14-15). Corporal DeLeon found it suspicious that the bill of lading only listed the load "general merchandise," contained a distorted bar code and was not signed by either the shipper or the driver/carrier.[4] (Id. at 17, 20-21). Corporal DeLeon also found it suspicious that Almaguer claimed that he picked up the trailer after it had already been sealed.[5] (Id. at 17). Finally, Corporal DeLeon stated he found Almaguer's and

---

[3] Corporal DeLeon testified that anyone present in a tractor-trailer and listed as co-driver must maintain a logbook even if they do not actually drive. (Sept. Hr'g Tr. at 14).

[4] Corporal DeLeon stated that he had only seen two bill of ladings that listed the trailer's load as "general merchandise" in his entire career. (Sept. Hr'g Tr. at 16).

[5] Corporal DeLeon testified that, typically, truck drivers personally observe the loading process. (Sept. Hr'g Tr. at 17). Corporal DeLeon based this statement on training he received regarding commercial driving and his numerous encounters with truck drivers. (Id. at 17-19).

Fraguela's route to New York suspicious because it avoided truck checkpoints utilized by the Pennsylvania State Police on Interstate 81, and noted that could not verify the existence of the destination listed on the bill of lading, Elmsford, New York. (Id. at 22-23, 28).

During the stop, Corporal DeLeon prepared a written warning for Almaguer for improper lane change and Fraguela's missing logbook. (Gov't Ex. 3). Corporal DeLeon testified that he handled the traffic stop and written warning "relatively quickly."[6] (Dec. Hr'g Tr. at 38). At approximately 11:50 a.m., Corporal DeLeon started to run a criminal history, warrant, and driver's license check on Almaguer from his squad car. (Sept. Hr'g Tr. at 25). At 11:52 a.m., Corporal DeLeon contacted Corporal Kenny Brown ("Corporal Brown") at the Pennsylvania State Police communications center to assist him in checking Almaguer's and Fraguela's criminal history and run the license plates of the tractor and trailer.[7] (Vid. R. at 11:52-11:59).

At 12:09 a.m., Corporal DeLeon ran a warrant check on Fraguela through the National Crime Center Information ("NCIC") database from his squad car. (Dec. Hr'g Tr. at 12, 21-22); (Fraguela-Casanova Ex. 3). At 12:10 a.m., the system returned a "hit" on Fraguela. (Dec. Hr'g Tr. at 12-13); (Fraguela-Casanova Ex. 3). The "hit"

---

[6] It is unclear from the record exactly when Corporal DeLeon completed the written warning.

[7] Corporal Brown had access to additional criminal history records not available to Corporal DeLeon in his squad car. (Dec. Hr'g Tr. at 50).

4

was a "probation or supervised release status record" from Miami Probation and

Parole which indicated Fraguela had recently been placed on parole in Miami,

Florida.[8] (Dec. Hr'g Tr. at 13); (Fraguela-Casanova Ex. 3). The record stated "DO

NOT ARREST BASED ON THIS INFORMATION - PLEASE CONTACT

SUPERVISING AGENCY VIA NLETS, TELEPHONE OR EMAIL TO ADVISE OF

CONTACT WITH SUPERVISED INDIVIDUAL. PLEASE BE ADVISED THAT

SUPERVISING AGENCY MAY NOT BE OPERATIONAL 24/7." (Fraguela-

Casanova Ex. 3). Corporal DeLeon contacted Corporal Brown and requested him to

determine whether Miami Probation and Parole would revoke Fraguela's probation

for traveling to the Commonwealth of Pennsylvania. (Sept. Hr'g Tr. at 25); (Dec.

Hr'g Tr. at 24-25). Corporal DeLeon did not know whether Fraguela's order of

probation prohibited him from traveling to the Commonwealth Pennsylvania or

whether Fraguela had permission to leave Florida. (Dec. Hr'g Tr. at 24-25).

Corporal DeLeon testified that when a NCIC "hit" indicates an individual has an

*outstanding warrant*, and the individual is not otherwise in custody, he must verify

the validity of the warrant within ten minutes. (Dec. Hr'g Tr. at 28); (Fraguela-

---

[8] At the evidentiary hearing in September, Corporal DeLeon testified on several occasions that the "hit" involved an outstanding warrant and referred to Fraguela as "wanted." (See, e.g., Sept. Hr'g Tr. at 89). At the evidentiary hearing in December, Corporal DeLeon admitted that no warrant existed and stated he used the term "wanted" at the September hearing to refer to Fraguela's parole hit that necessitated further inquiry. (See generally Dec. Hr'g Tr.). Assuming *arguendo* that Corporal DeLeon believed the NCIC "hit" indicated the existence of warrant on October 25, 2010, this belief was objectively unreasonable. Fraguela's "hit" plainly indicated only that Fraguela had recently been released on parole. (See Fraguela-Casanova Ex. 3).

Casanova Ex. 4, at 47). Corporal DeLeon stated that he did not recall any training

on what actions to take when encountering a parolee during a traffic stop, but that

he always tries to make contact with the supervising parole agency. (Dec. Hr'g Tr. at

23). Corporal DeLeon testified that he learned at some point after 12:51 p.m. that

Miami Probation and Parole would not revoke Fraguela's probation. (Dec. Hr'g Tr.

at 50).

At 12:27 p.m., Corporal DeLeon spoke with Corporal Brown about Almaguer

and Fraguela. (Vid. R. at 12:27-12:28). After speaking to Corporal Brown, Corporal

DeLeon stated "that we are now waiting for a response back from Florida" and

discussed Almaguer's and Fraguela's "rap sheets" (i.e. criminal histories). (Id. at

12:28-12:30). At 12:40 p.m., Corporal DeLeon again spoke to Corporal Brown. (Vid.

R. at 12:40).

At 12:51 p.m., seventy-four minutes after returning to his squad car and

eighty-six minutes after initiating the traffic stop, Corporal DeLeon exited his squad

car and returned Almaguer's documents.[9] (Vid. R. at 12:51). Corporal DeLeon

engaged Almaguer in further discussion about Almaguer's route and the tractor-

trailer's load. (Vid. R. at 12:51-12:59). At 12:59 p.m., ninety-four minutes after the

---

[9] Two other Pennsylvania State Police officers arrived at the scene at
approximately 12:51 p.m. (Vid. R. at 12:51). Corporal Deleon testified that the
officers had contacted him at some point during the stop and that he never
requested backup. (Sept. Hr'g Tr. at 92). At 11:58 a.m., Corporal DeLeon stated to
the dispatcher "that a dog and another car" will arrive "momentarily." (Vid. R. at
11:58). It is unclear from the record why it took the other two Pennsylvania State
Police officers an additional fifty-three minutes to arrive at the scene.

initial traffic stop, Almaguer orally stated that Corporal DeLeon could search his "truck."  (Vid. R. at 12:59).  At 1:02 p.m., Almaguer signed a written consent to search form.[10]  At 1:11 p.m., one hundred and six minutes after initiating the stop, Corporal DeLeon and two other Pennsylvania State Police officers began to search the trailer. (Vid. R. at 13:11).  Inside the trailer, the officers found approximately 22,500 cartons of untaxed cigarettes and the officers placed Fraguela and Almaguer under arrest.[11] (Sept. Hr'g Tr. at 39).

## II.  **Procedural History**

On November 17, 2010, a federal grand jury sitting in the Middle District of Pennsylvania returned a three-count Indictment charging Almaguer and Fraguela with (1) conspiracy to transport stolen goods in interstate commerce and conspiracy to transport contraband cigarettes in violation of 18 U.S.C. § 371; (2) transportation of contraband cigarettes in violation of 18 U.S.C. § 2342(a); and (3) interstate transportation of stolen goods in violation of 18 U.S.C. § 2314.  (Doc. 18).  Almaguer and Fraguela pled not guilty to all counts.  (Docs. 28, 32).  Almaguer filed the instant motion (Doc. 61) to suppress evidence on May 6, 2011.  On August 28, 2011, Fraguela filed an unopposed motion (Doc. 87) for leave to join and adopt Almaguer's motion to suppress evidence.  The court granted Fraguela's motion on August 29, 2011.  (Doc.

---

[10]  The written consent form listed only the "tractor" under the header "VEHICLES TO BE SEARCHED."  (Gov't Ex. 2).  The parties dispute whether Almaguer consented to a search of the trailer.

[11]  Subsequent investigation revealed that the cigarettes were stolen.

88).  The court conducted an evidentiary hearing on September 1, 2011.  On

December 13, 2011, the court conducted a supplemental evidentiary hearing.[12]  The

motion has been fully briefed and is now ripe for disposition.  (See Docs. 69, 72, 86,

100, 122, 124).

## III.    **Discussion**

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated,
> and no Warrants shall issue, but upon probable cause, supported by Oath
> or affirmation, and particularly describing the place to be searched, and
> the persons or things to be seized.

U.S. CONST. amend. IV.  Almaguer and Fraguela assert that Corporal DeLeon

violated their Fourth Amendment rights by illegally seizing them on October 25,

2010.  Almaguer's and Fraguela's motion to suppress raises three issues: (1) the

legality of the initial traffic stop; (2) whether Corporal DeLeon possessed reasonable,

articulable suspicion of criminal activity to justify expanding the scope of his inquiry

---

[12]  The court reopened the hearing upon motion (Doc. 110) to allow Fraguela
and Almaguer to cross-examine Corporal DeLeon on newly discovered evidence
relevant to October 25, 2010, traffic stop.  The court also allowed the United States
to redirect Corporal DeLeon's on factors that prolonged the stop.  (Dec. Hr'g Tr. at
45-46).

beyond the reason for the traffic stop; and (3) the reasonableness of the length and scope of the stop.[13]

## A.    Initial Stop

Almaguer and Fraguela contend that Corporal DeLeon did not have probable cause or reasonable suspicion to stop the tractor-trailer on October 25, 2010. When an officer has probable cause or reasonable suspicion to believe that a traffic violation has occurred, the officer may stop the vehicle. Whren v. Unites States, 517 U.S. 806, 810 (1996); United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). For Fourth Amendment purposes, a traffic stop is a seizure of both the driver and any occupants of a vehicle. Brendlin v. California, 551 U.S. 249, 257 (2007); Delaware v. Prouse, 440 U.S. 648, 653 (1979).

In the instant case, Corporal DeLeon testified credibly that he initiated the stop after he personally observed the tractor-trailer change lanes without signaling in violation of the Pennsylvania Motor Vehicle Code. (Sept. Hr'g Tr. at 8). See 75 PA. CON. STAT. § 3334. Almaguer and Fraguela argue that Corporal DeLeon could not have personally observed an improper lane change because Corporal DeLeon was assisting another motorist at the Interstate 81 interchange of the Pennsylvania

---

[13] Almaguer also contends that he did not consent to the search of the trailer. It is unnecessary for the court to resolve this issue because the court concludes Corporal DeLeon's traffic stop and subsequent investigatory detention constituted a *de facto* arrest without probable cause and the United States has not argued that Almaguer's consent "purge[d] the taint of the illegality for Fourth Amendment purposes." United States v. Mosley, 454 F.3d 249, 261 n.19 (3d Cir. 2006) (citing United States v. Snype, 441 F.3d 119, 133 (2d Cir. 2006) (collecting cases)).

Turnpike and that the proffered reason was a "mere pretext." (See Doc. 69, at 4). Corporal DeLeon testified, however, that he witnessed the improper lane change after he resolved the incident with the other motorist. (Sept. Hr'g Tr. at 8).

Corporal DeLeon's subjective motivation for stopping the tractor-trailer is irrelevant. In Whren, the Supreme Court held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" and noted that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." 517 U.S. at 813 (quotations and citations omitted). Based upon the record before it, the court finds that Corporal DeLeon had probable cause to initiate the traffic stop.

### B. Investigative Detention

Almaguer and Fraguela assert that Corporal DeLeon did not have reasonable suspicion to detain them after effectuating the purpose of the initial traffic stop. If a police officer develops "a reasonable, articulable suspicion of criminal activity," after a lawful traffic stop, then the police officer "may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003) (citation omitted); see also Terry v. Ohio, 392 U.S. 1, 21 (1968) (establishing the parameters of brief investigatory stops supported by reasonable suspicion). Reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal

activity" viewed from the perspective of an objectively reasonable law enforcement official. Ornelas v. United States, 517 U.S. 690, 696 (1996) (citations and quotations omitted). The reasonable suspicion inquiry involves probabilities not certainties. See United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Valentine, 232 F.3d 350, 359 (3d Cir. 2000) (remarking that reasonable suspicion may be "based on acts capable of innocent explanation"). In assessing whether a police officer had reasonable suspicion to detain an individual for investigatory purposes, courts must consider the "totality of the circumstances, in light of the officer's experience." Givan, 320 F. 3d at 458 (noting that the Supreme Court has "accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience"). To satisfy the Fourth Amendment, the officer must articulate "some minimal objective justification for an investigatory" beyond an inchoate hunch. Id. (citing United States v. Sokolow, 490 U.S. 1, 13 (1989)).

In the case *sub judice,* the court concludes that the totality of the circumstances provided Corporal DeLeon with reasonable suspicion to detain

Almaguer and Fraguela for further investigation.[14]  Corporal DeLeon justified the

investigatory detention on the following circumstances: (1) Almaguer did not

acknowledge his presence and Fraguela appeared to be hunched in his seat at the

Interstate 81 interchange of the Pennsylvania Turnpike; (2) Almaguer appeared

nervous during the initial encounter at mile marker 228.4; (3) Fraguela did not have a

logbook despite being listed as a secondary driver by Almaguer; (4) Fraguela could

not converse in English; (5) Almaguer's logbook did not document how Almaguer got

from his stated origination point, Florida, to Kentucky where he stated he picked up

the trailer; (6) the bill lading listed the load as "general merchandise" and Almaguer

stated he received the trailer after the load had been sealed; (7) the bill lading

contained a distorted UPC code and was unsigned; (8) Almaguer's and Fraguela's

route; and (9) that he could not verify the existence of the destination listed on the bill

of lading, Elmsford, New York in his trucker's atlas.  Although Almaguer and

---

[14]  It is unclear from the record exactly when the initial traffic stop ended and
the investigative <u>Terry</u> detention began.  The United States ostensibly concedes
that Corporal DeLeon quickly expanded his investigation outside of the scope of the
initial traffic scope for an improper lane change and therefore needed reasonable
suspicion to detain Almaguer and Fraguela for further investigation.  (<u>See</u> Doc. 124,
at 15-18).  Corporal DeLeon did not provide Almaguer with the written warning
until approximately 12:52 p.m, but Corporal DeLeon's testimony indicates that he
expanded the scope of the detention to include an investigation of other possible
criminal activity shortly after the initiating the stop.  The court concludes that it is
unnecessary to delineate an exact boundary between the initial traffic stop and the
investigatory detention because the instant case involves a single ongoing seizure.
Corporal DeLeon's conduct during the stop would not have communicated to a
reasonable person that Almaguer and Fraguela were "free to decline the officer's
requests or otherwise terminate the encounter."  <u>See</u> <u>Florida v. Bostick</u>, 501 U.S.
429, 439 (1991).

Fraguela persuasively argue that some of the circumstances noted by Corporal DeLeon are subject to innocent explanations, it is not proper for the court to examine each circumstance individually.[15]  Rather, the court must consider the "totality of the circumstances—the whole picture." Sokolow, 490 U.S. at 8.  Therefore, taking all of the circumstances together, the court concludes that Corporal DeLeon had reasonable suspicion to justify expanding the scope of his inquiry beyond the initial purpose of the traffic stop.

_____

[15] Conversely, the numerous, and potentially innocent, explanations for Corporal DeLeon's "suspicions" support the court's ultimate conclusion that the seizure was not sufficiently limited in scope and duration.  See United States v. Leal, 235 F. App'x 937, 942 (3d Cir. 2007) (finding that the quantity and quality of police officer's reasonable suspicion factors in conjunction with the officer's diligent efforts to verify his suspicions demonstrated the reasonableness of the Terry stop).  By way of illustration, unlike the police officer in Leal, Corporal DeLeon never connected his "suspicions" to any specific type of criminal activity.  United States v. Leal, 385 F. Supp. 2d 540, 548 (W.D. Pa. 2005) (officer testified that the circumstances that contributed to his reasonable suspicion were "consistent with a drug courier profile.").

Almaguer and Fraguela argue that Corporal DeLeon improperly asked for documentation unrelated to the traffic stop including Almaguer's and Fraguela's logbooks and the bill of lading prior to acquiring reasonable suspicion. The court finds that in a highly regulated industry such as interstate trucking, police officers are permitted to request both drivers and passengers for bills of lading and other items related to the operation of a truck as part of an ordinary traffic stop. See, e.g., United States v. Pauyo, 341 F. App'x 955, 956 (5th Cir. 2009); United States v. Rodriguez–Alejandro, 664 F. Supp. 2d 1320, 1337 (N.D. Ga. 2009).

Almaguer also argues that Corporal DeLeon's affidavit of probable cause failed to include several key facts that—according to his testimony at the suppression hearing—contributed to his reasonable suspicion. This argument is unavailing. The factual basis of Corporal DeLeon's probable cause to arrest Almaguer is an inquiry wholly distinct from the factual basis of Corporal DeLeon's reasonable suspicion to detain Almaguer for investigatory purposes. Accordingly, the court concludes that Corporal DeLeon had articulable reasonable suspicion to detain Almaguer and Fraguela, and, thereafter, to employ investigatory techniques likely to confirm or dispel his suspicions *with appropriate dispatch*. See United States v. Sharpe, 470 U.S. 675, 686 (1985).

## C. Length of the Stop

Almaguer and Fraguela argue that the length and scope of the stop violated their Fourth Amendment rights. A law enforcement official may conduct a brief investigatory stop if they have "reasonable, articulable suspicion that criminal

activity is afoot," but police officers must have probable cause to justify longer and more intrusive detentions. <u>Sharpe</u>, 470 U.S. at 685. <u>Terry</u> does not permit police officers to detain suspects indefinitely to complete an investigation. <u>Dunaway v. New York</u>, 442 U.S. 200, 212 (1979); <u>United States v. Leal</u>, 235 F. App'x 937, 940 (3d Cir. 2007). The United States has the burden of proving that Almaguer's and Fraguela's seizure "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983); <u>see</u> <u>also</u> <u>United States v. Coward</u>, 296 F.3d 176, 180 (3d Cir. 2002).

The Third Circuit has aptly noted that "[t]he line between a proper Terry stop and an improper *de facto* arrest is elusive and not easily drawn." <u>Id.</u> at 940 (citing <u>Sharpe</u>, 470 U.S. at 685). The Supreme Court has refused to impose a rigid, bright-line time limitation on <u>Terry</u> stops. <u>Sharpe</u>, 470 U.S. at 685 ("[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."); <u>Place v. United States</u>, 462 U.S. 696, 709 n.10 (1983). To determine whether a stop is "so minimally intrusive as to be justifiable on reasonable suspicion" courts must consider a number of factors including: (1) the duration of the stop; (2) the purposes justifying the investigatory detention; (3) whether the police acted diligently to confirm or dispel their suspicions; and (4) any reasonable alternatives the police could have employed to serve their purposes. <u>Sharpe</u>, 470 U.S. at 684-87; <u>Leal</u>, 235 F. App'x at 941. In <u>Sharpe</u>, the Supreme Court cautioned that courts "should not indulge in unrealistic second-guessing" and noted that "[a] creative judge engaged in *post hoc* evaluation of

police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." Sharpe, 470 U.S. at 686-97 (citations omitted) (emphasis in original). Nonetheless, courts must ensure that police officers employ investigative methods that allow them "to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500 (citations omitted).

In United States v. Leal, a police officer lawfully stopped defendant Robert Leal's automobile for a traffic violation at approximately 1:30 p.m. on February 2, 2004.[16] Leal, 235 F. App'x at 938; United States v. Leal, 385 F. Supp. 2d 540, 542 (W.D. Pa. 2005). The officer suspected the vehicle contained narcotics and requested a canine unit to respond to the scene at approximately 1:45 p.m. Leal, 385 F. Supp. 2d at 544. The canine unit arrived at the scene approximately forty-five minutes to an hour later resulting in a hour and twenty minute detention. Leal, 235 F. App'x at 940; Leal 385 F. Supp. 2d at 545. The delay in the canine unit's arrival stemmed from traffic and construction on the Pennsylvania Turnpike. Id. The Third Circuit panel affirmed the district court's denial of Leal's motion to suppress, holding that "Leal's detention may have bumped up against the outer limit of a Terry stop, but it did not cross it." Leal, 235 F. App'x at 942. The Leal court reasoned that the quantity and

---

[16] The court recognizes that Leal is a non-precedential Third Circuit opinion. Nevertheless, the case is persuasive because it cogently illustrates the application of Supreme Court precedent to distinguish a Terry stop from a *de facto* arrest. As set forth below, the differences between the case *sub judice* and Leal highlight the unreasonableness of Almaguer's and Fraguela's detention.

quality of the officer's reasonable suspicion factors in conjunction with his diligent efforts to investigate demonstrated the reasonableness of the <u>Terry</u> stop.  <u>Id.</u>  The Third Circuit panel noted that the officer's efforts to "expeditiously resolve his suspicions were frustrated by circumstances beyond his control" (i.e. the traffic and construction that delayed the canine unit).  <u>Id.</u>  The court explicitly stated, however, that law enforcement officers "should make appropriate inquiries to ensure that the delay attendant to any additional investigation is not so lengthy or restrictive that it runs afoul of the parameters prescribed by <u>Terry</u>" and, even if such precautions are taken, the length of the stop may make the detention "tantamount to an arrest."  <u>Id.</u> at 942 n.1.

Although the line between a <u>Terry</u> stop and an improper *de facto* arrest is often difficult to pinpoint, it is a line that courts must draw in furtherance of the principles underlying the Fourth Amendment.  The court cannot divorce <u>Terry</u> stops from their underlying rationale.  In <u>Terry</u>, the Supreme Court declared that a <u>Terry</u> stop is "wholly different kind of intrusion upon individual freedom" and therefore may be justified on the basis of reasonable suspicion.  392 U.S. at 26.  To protect important Fourth Amendment interests, the Supreme Court has circumscribed <u>Terry</u> stops to brief seizures designed to allow police to diligently employ investigative methods in

order to quickly verify or dispel their suspicions.[17] Royer, 460 U.S. at 500. Terry investigatory detentions clearly do not permit law enforcement officials to detain individuals "for as long as necessary to discover whether probable cause can be established." Sharpe, 470 U.S. at 691 (Marshall, J., concurring in judgment). In the instant case, Corporal DeLeon's seizure of Almaguer and Fraguela on October 25, 2010, was neither brief nor diligently pursued. Accordingly, the court concludes that the length and scope of the Corporal DeLeon's traffic stop and subsequent investigatory detention constituted a *de facto* arrest without probable cause.

The United States has failed to meet its burden of demonstrating that Almaguer's and Fraguela's hour and thirty four minute detention, purportedly justified on the basis of reasonable suspicion, "was sufficiently limited in scope and duration to satisfy conditions of investigative seizure." See Florida v. Royer, 460 U.S. at 500. Almaguer orally consented to a search of his "truck" at 12:59 p.m., ninety-four minutes after Corporal DeLeon initiated the traffic stop at 11:25 a.m. (Vid. R. at 11:25-12:59). After initiating the traffic stop, Corporal DeLeon collected various documents from Almaguer and Fraguela. At 11:37 a.m., Corporal DeLeon returned to his squad car where he remained with Almaguer's and Fraguela's documents for

_____

[17] In United States. v. Montoya de Hernandez, 473 U.S. 531 (1985), the Supreme Court held that a sixteen hour investigatory detention was not unreasonably long. The case is clearly distinguishable from the above-captioned matter because it occurred on an international border "where the Fourth Amendment balance of interests leans heavily to the Government" and the delay resulted "*solely* from the method by which [the defendant] chose to smuggle illicit drugs." Id. (emphasis added).

*seventy-four* minutes. This seventy-four minute delay is unjustifiable because Corporal DeLeon failed to diligently pursue "a means of investigation that was likely to confirm or dispel" his suspicions quickly. <u>Sharpe</u>, 470 U.S. at 687; <u>Royer</u>, 460 U.S. at 500.

Upon returning to his squad car at 11:37 a.m., Corporal DeLeon reviewed Almaguer's and Frageula's documents which consisted of Almaguer's and Fraguela's commercial driver's licenses, medical cards, the bill lading (a one page form), and Almaguer's logbook (three pages). Corporal DeLeon's testimony reveals that he finished examining the documents within the first half and hour of the stop (11:25 a.m.–11:55 a.m.) prior to initiating criminal history, warrant, and driver's license checks, and that he prepared Almaguer's written warning "relatively quickly."[18] (<u>See</u> Sept. Hr'g Tr. at 24-25; Dec. Hr'g Tr. at 38). Yet, Corporal DeLeon failed to employ any investigative methods likely to quickly verify or dispel his suspicions that the tractor-trailer contained contraband for at least another fifty-six minutes.[19] Specifically, Corporal DeLeon did not request Almaguer's consent, further question

---

[18] The video reflects that Corporal DeLeon requested Corporal Brown's assistance in retrieving Almaguer's criminal history records and driving records at 11:52 a.m. (Vid. R. at 11:52).

[19] At the suppression hearings, Corporal DeLeon never specifically identified the nature of the criminal activity that he believed was afoot. Logically, however, the court presumes that he expanded the scope of traffic stop to investigate whether the tractor-trailer contained drugs, weapons, or other illegal materials.

Almaguer or Fraguela, request the assistance of a K-9 unit, or otherwise take any

action related to investigating the contents of the tractor/trailer.[20]

At the September evidentiary hearing, Corporal DeLeon appeared to attribute

the delay in his investigation primarily to the necessity of verifying Fraguela's NCIC

"hit." Corporal DeLeon testified that Almaguer would have been free to leave

twenty-five minutes prior to when he orally consented to the search:

| | |
|---|---|
| Attorney Pasqualini: | Sure, but like 25 minutes before that you could have said here's your goodies, have a nice day, I'm only giving you - - |
| Corporal DeLeon: | He [Almaguer] could have left, he could have left, but Mr. [Fraguela] would not have been permitted to leave until I received confirmation that he was not in fact going to be extradited. |
| Attorney Pasqualini: | Sure. So you could have just given him all his stuff and said, "You can go, but you're going to have to leave your friend." |
| Corporal DeLeon: | I could have, yes. |
| Attorney Pasqualini: | And you did not do that? |
| Corporal DeLeon: | No. |

---

[20] The United States notes that traffics stops are "especially fraught with danger to police officers" and officers must be permitted to "exercise unquestioned command of the situation." Michigan v. Long, 463 U.S. 1032, 1047 (1983); Michigan v. Summers, 452 U.S. 692, 703 (1981). Absent from the record, however, is any testimony that Corporal DeLeon delayed taking further investigatory action because of safety concerns. See Cortez v. McCauley, 478 F.3d 1108, 1130 (10th Cir. 2007) (noting that officers may take appropriate steps to protect their safety during a Terry stop). Corporal DeLeon explicitly stated that he never called for backup, that he could not recall when the other officers arrived, and that he did not fear for his safety. (Sept. Hr'g Tr. at 90, 92, 110).

(Sept. Hr'g Tr. at 106-07). Counsel for Almaguer and Fraguela cross-examined

Corporal DeLeon on this testimony at the December supplemental evidentiary

hearing and Corporal DeLeon responded by stating "Mr. Almaguer was being

detained because of the stop. There was (sic) a whole lot of issues with the stop."

(Dec. Hr'g Tr. at 34). Corporal DeLeon testified that he needed to discuss certain

issues with Almaguer and ask for his consent to search, but conspicuously absent

from the record is any rational reason for his delay in undertaking these tasks. (Id. at

34-35). That Fraguela's alleged "wanted" status caused considerable delay is

suggested by the videotape when Corporal DeLeon explains (at 12:28 p.m.): "we are

now waiting for a response back from Florida . . . to see if they are going to extradite."

(Vid. R. at 12:28).

    Fraguela's NCIC "hit" cannot justify the hour and thirty four minute

detention. At 12:09 p.m., Corporal DeLeon ran a warrant check on Fraguela.

(Fraguela-Casanova Ex. 3). At 12:10 p.m., a "hit" displayed on Corporal DeLeon's

computer unambiguously showing only that Fraguela was on *probation*. (Fraguela-

Casanova Ex. 3). Corporal DeLeon testified that NCIC guidelines instruct officers to

verify the validity of an *arrest warrant* on the NCIC system within ten minutes of

receiving the "hit" if the person is not otherwise in custody. (Fraguela-Casanova

Ex. 4; Dec. Hr'g Tr. at 28-30). It is undisputed that the purpose of this policy is to

avoid prolonged Terry detentions which cross the line to unlawful seizures. (Dec.

Hr'g Tr. at 30). In this case, Corporal DeLeon sought to determine whether Miami

Probation and Parole *might* want to revoke Almaguer's *parole*. Corporal DeLeon had

21

not a clue whether Fraguela's order of probation even prohibited his travel to the Commonwealth Pennsylvania. (Dec. Hr'g Tr. at 48). Clearly, a parole inquiry cannot justify prolonging a detention beyond the limits set for verifying the existence of an arrest warrant. Thus, Fraguela's NCIC "hit" at 12:10 p.m. simply does not excuse Corporal DeLeon's failure to employ investigative methods likely to verify or dispel his suspicions that criminal activity was afoot until 12:51 p.m.[21]

The United States attributes the majority of the delay to Corporal DeLeon's retrieval and review of the criminal history records of Almaguer and Fraguela.[22] (Doc. 124, at 18). The court recognizes that an officer may run a computer criminal history during a lawful traffic stop. United States v. Roberts, 77 F. App'x 561, 562 (3d Cir. 2003); United States v. Jones, 234 F.3d 234, 240 (5th Cir. 2000); United States v. Frierson, No. 10-CR-751, 2011 WL 3862142, *6 (E.D. Pa. 2011). However, permissible criminal history checks typically involve the computer access of *readily available* information at the beginning of a traffic stop. See, e.g., United States v. Jones, 234 F.3d at 237-238 (officer requested the dispatcher to run a criminal history check seven minutes after initiating the stop and received the information back ten minutes

---

[21] To be pellucidly clear, the court is not suggesting that Corporal DeLeon's inquiry to Miami Probation and Parole was improper or unjustified. To the contrary, his follow-up inquiry was prudent under the circumstances. However, this limited inquiry cannot be bootstrapped into justification for extended detention, and it certainly does not explain Corporal DeLeon's failure to continue his *investigation* of the Terry stop in a timely manner.

[22] Corporal DeLeon also ran driver's license and warrants checks on Almaguer and Fraguela, but the United States has not asserted, nor does the record reflect, that this materially contributed to the length of the stop.

later); Roberts, 77 F. App'x at 562 (entire stop lasted ten minutes); Frierson, 2011 WL

3862142 at *6 (officer completed the criminal history check within the first sixteen

minutes of the traffic stop). In the instant case, Corporal DeLeon waited for Corporal

Brown to run an exhaustive, state-by-state search of Almaguer's and Fraguela's

criminal histories. (Sept. Hr'g Tr. at 113) Corporal DeLeon acknowledged that this

type of criminal history check takes a "long time" to complete.[23] (Id.)

The court finds that Corporal DeLeon acted dilatorily by pursuing tangential

information unrelated to the apparent objective of the investigatory

detention—verifying or dispelling whether Almaguer and Fraguela were transporting

illegal materials. At most, the criminal history of a detainee may provide information

about the type of criminal activity afoot or contribute to an officer's development of

reasonable, articulable suspicion. However, exhaustive, state-by-state criminal

checks do precious little to advance the investigatory officer's duty to quickly verify

or dispel the suspicion of criminal activity afoot. In Leal, the arrival of the K-9 unit

almost immediately provided the officer with probable cause to tow the vehicle to the

local police barracks and obtain a search warrant. Leal, 385 F. Supp. 2d at 545. In

sharp contrast, a detainee's record *ipso facto* cannot establish probable cause and,

---

[23] At the December evidentiary hearing, Corporal DeLeon clarified that this state-by-state process involved checking for criminal history records, not arrest warrants. (Dec. Hr'g Tr. at 54-55).

conversely, the absence of a criminal history *ipso facto* cannot dissipate existing

reasonable suspicion.[24]

In the case *sub judice*, the record underscores that Corporal DeLeon

conducted a fishing expedition unrelated to verifying or dispelling his suspicion of

criminal activity afoot. Corporal DeLeon testified:

> "Well, as I said I'm going through his history and his criminal history
> and stuff like that to see if there's any reason that anything else besides
> this that would lead me to *suspect* illegal activity."

(Sept. Hr'g Tr. at 112-13 (emphasis added)). After retrieving and reviewing

Almaguer's and Fraguela's criminal records, Corporal DeLeon sought to further

question Almaguer and to request consent to search. The hour and thirty four

minute detention in this case is distinguishable from other cases in which extended

detentions were directly caused by unexpected developments in investigatory

methods otherwise expected to quickly verify or dispel the officer's suspicions.[25] See,

e.g., Sharpe, (holding that a twenty-minute Terry stop was reasonable because the

suspect's evasive actions caused the delay); Leal, 235 F. App'x at 942 (finding that an

_____

[24] An exhaustive, time-consuming search for criminal records is readily distinguishable from a comprehensive search for arrest warrants. The existence of a valid arrest warrant *ipso facto* would establish probable cause. Moreover, if the officer's reasonable suspicion relates to the existence of an arrest warrant, a warrant check is the only investigative method reasonably likely to verify or dispel the officer's suspicion.

[25] The court recognizes that advances in law enforcement databases may shorten the time for comprehensive criminal history checks. In the instant case, however, the time expended to conduct the comprehensive state-by-state search was excessive.

eighty-minute <u>Terry</u> stop did not constitute a *de facto* arrest because the officer had to wait for the arrival of a K-9 unit to continue his investigation); <u>United States v. Frost</u>, 999 F.2d 737, 742 (3d Cir. 1993) (holding that an eighty-minute detention of a suspect's luggage was reasonable because officers acted diligently by immediately requesting a K-9 unit).

Moreover, the court finds that Corporal DeLeon neglected to take appropriate action to minimize the delay. In <u>United States v. Place</u>, 462 U.S. 696, 698 (1983), the defendant, Raymond Place ("Place"), aroused police officers' suspicions in the Miami International Airport. The officers had reasonable suspicion to suspect Place's luggage contained narcotics. <u>Id.</u> The officers allowed Place to board his flight to LaGuardia Airport in New York, but notified Drug Enforcement Administration authorities in New York about their suspicions. <u>Id.</u> Two DEA agents awaited Place's arrival at LaGuardia Airport and seized his luggage. <u>Id.</u> The agents transported the luggage to Kennedy Airport to subject the luggage to a dog sniff, resulting in a ninety minute seizure. <u>Id.</u> The Supreme Court held that the ninety minute detention of Place's luggage exceeded the limits prescribed in <u>Terry</u>. <u>Id.</u> at 709-10. The <u>Place</u> court reasoned that the officers failed to minimize the intrusion on Place's Fourth Amendment rights by neglecting to arrange for a K-9 in advance of Place's arrival at an airport. <u>Id.</u> at 709. Similarly, in the instant case, Corporal DeLeon could have easily minimized the intrusion on Almaguer's and Fraguela's Fourth Amendment interests by initiating the time-consuming criminal history checks immediately upon his return to the squad car at 11:37 a.m. (Sept. Hr'g Tr. at 111, 113).

25

The United States also failed to adduce specific testimony to account for Corporal DeLeon's time on the vast majority of the stop. With the exception of the first half hour of the stop, Corporal DeLeon's testimony, at best, provides only conclusory explanations for the delay. (See, e.g., Dec. Hr'g Tr. at 37-38). Corporal DeLeon requested assistance from Corporal Brown in running Almaguer's criminal history at 11:52 a.m, twenty-seven minutes after initiating the traffic stop. (Vid. R. at 11:52). Corporal DeLeon remained in his squad car with Fraguela's and Almaguer's documents for another fifty-nine minutes. The United States argues, without citation to the record, that Corporal DeLeon "was slowed due to multiple hits for each Defendant that he was required to sort through."[26] (Doc. 124, at 19). There is very limited testimony regarding: (1) the substance of Corporal DeLeon's criminal history review; (2) the timing of Corporal DeLeon's receipt of the criminal records relating to Almaguer and Fraguela; and (3) other circumstances that contributed to the delay.

---

[26] Corporal DeLeon testified generally that an *NCIC warrant check* may require sorting through multiple hits. (See Sept. Hr'g Tr. at 96). There is no specific testimony on how many NCIC "hits" he received for Almaguer and Fraguela. The video also reflects that Corporal DeLeon called Corporal Brown at 11:54 a.m to obtain assistance sorting through "multiple hits" for Almaguer's *criminal history records*. (Vid. R. at 11:53-54 (requesting assistance on obtaining "a couple of rap sheets")). There is no record evidence that this "sorting" process required nearly an hour to complete. To the contrary, the video suggests that this task concluded no later than 12:30 p.m. (Vid. R. at 12:30 (discussing Almaguer's and Fraguela's criminal histories)).

Based upon the record, the court concludes that Corporal DeLeon did not act diligently in pursuing his investigation during the hour and thirty-minute detention.[27]

For the ordinary citizen, a traffic stop is the most common encounter with law enforcement. See South Dakota v. Opperman, 428 U.S. 364, 368 (1976) (stating that traffic stops are an "everyday occurrence"); Maryland v. Wilson, 519 U.S. 408, 419 (1997) (Stevens, J., dissenting) (noting that Maryland alone had over one million traffic stops between 1994 and 1995); United States v. Mosley, 454 F.3d 249, 268-69 (3d Cir. 2006). Police officers may initiate a traffic stop for any technical violation of a traffic code and may expand the scope of their inquiry on the basis reasonable, articulable suspicion of criminal activity. See Mosley, 454 F.3d at 252. That many innocent travelers are subjected to Terry stops on this nation's roads and highways is undisputed. Without appropriate limits, such as those articulated in the instant memorandum, officers could invoke Terry and detain innocent travelers indefinitely to retrieve and to scrutinize criminal records. Extended detentions of this nature significantly interfere with travelers' legitimate privacy interests, with *de minimis* corresponding benefits to law enforcement. Quite simply, a state-by-state criminal history records check is not an investigative method consonant with quickly verifying or dispelling an officer's suspicion of criminal activity afoot.

---

[27] The court does not suggest that the United States must account for police officers' actions minute-by-minute during a Terry stop. However, in the matter *sub judice*, Corporal DeLeon's conclusory, non-specific testimony fails to provide adequate justification for the length of this Terry stop.

For all these reasons, the court concludes that Corporal DeLeon's ninety-four minute detention of Almaguer and Fraguela ran afoul of the parameters prescribed by <u>Terry</u> and constituted a *de facto* arrest.

### D. <u>Application of the Exclusionary Rule</u>

Subject to a number of exceptions, the exclusionary rule "mandates that evidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.'" <u>United States v. Pelullo</u>, 173 F.3d 131, 136 (3d Cir. 1999) (citation omitted). The exclusionary rule applies only when the evidence derives directly from the constitutional violation. <u>Wong Sun v. United States</u>, 371 U.S. 471, 487–88 (1963). In other words, a defendant must demonstrate a casual "but for" connection between the challenged evidence and the constitutional violation. <u>Mosley</u>, 454 F.3d at 253.

In the instant action, Almaguer and Fraguela seek to suppress as the fruit of an unlawful seizure: (1) the cigarettes and other physical items seized from the tractor-trailer and (2) the oral and written statements obtained by police after their illegal seizure.[28] The casual nexus between the illegal seizure of Almaguer—the driver of the tractor-trailer—and the discovery of evidence in the trailer and any subsequent statements to law enforcement is self-evident. But-for Corporal DeLeon's illegal seizure of Almaguer, Corporal DeLeon would not have procured Almaguer's consent to search, discovered the untaxed cigarettes and arrested him.

---

[28] Fraguela adopted Almaguer's motion to suppress. The court construes Fraguela motion as seeking to suppress his *own* oral and written statements.

The more difficult question is whether Fraguela—the passenger of the tractor-trailer—may suppress the evidence discovered in the trailer and any subsequent statements to law enforcement as the fruit of the illegal seizure. "Fourth Amendment rights are personal rights which . . . . may not be asserted vicariously." Rakas v. Illinois, 439 U.S. 128, 134 (1978). Fraguela has not alleged that he has standing to contest the search of the trailer. Rakas, 439 U.S. at 422 ("[A] person aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Thus, the court must determine whether the evidence found in the trailer was casually linked to the illegal seizure of Fraguela, the passenger.[29]

The majority of circuits, including the Third Circuit, have held that passengers may suppress evidence discovered in a vehicle after an unlawful traffic stop. See, e.g., Mosley, 454 F.3d at 269; United States v. Chanthasouxat, 342 F.3d 1271 (11th Cir. 2003); United States v. Reed, 349 F.3d 457 (7th Cir. 2003); United States v. Guevara–Martinez, 262 F.3d 751 (8th Cir.2001); United States v. Twilley, 222 F.3d 1092 (9th Cir. 2000); United States v. Kimball, 25 F.3d 1 (1st Cir. 1994). More precisely, the majority of courts do not distinguish the passenger from the driver in analyzing whether evidence seized from the vehicle after an unlawful traffic stop was

---

[29] Fraguela does not claim that Corporal DeLeon's seizure of the tractor-trailer constituted a *de facto* seizure of his person. Therefore, this argument is waived absent a showing of good cause pursuant to Rule 12 of the Federal Rules of Criminal Procedure.

casually connected to the constitutional violation.  These courts view a traffic stop as a single constitutional violation with two distinct victims.  In <u>Mosley</u>, the Third Circuit panel reasoned that "a traffic stop is a single act, which affects equally all occupants of a vehicle" and "the purposes of the Fourth Amendment are best served by extending the bubble of proximate causation to vehicle passengers."  454 F.3d at 267.  However, the Third Circuit has not addressed the precise question before the court in the instant matter.  Here, the initially lawful stop became unlawful due to the lengthy detention of the vehicle without probable cause.  Thus, the question is whether the driver must be distinguished from passengers in analyzing the causal connection of evidence seized from an unlawfully detained vehicle to the constitutional violation.

### 1.  Heightened Factual Nexus Test

The Ninth and Tenth Circuits—over heated dissents—applied a "heightened" factual nexus test to passengers illegally detained after an initially lawful traffic stop. <u>United States v. DeLuca</u>, 269 F.3d 1128 (10th Cir. 2001);  <u>United States v. Pulliam</u>, 405 F.3d 782 (9th Cir. 2005).  These circuits distinguish the seizures of the driver, vehicle, and any occupants in analyzing whether evidence seized from a unlawfully detained

vehicle was casually linked to the constitutional violation.[30][31]  The undersigned finds

the *ratio decidendi* of <u>Pulliam</u> and <u>DeLuca</u> to be unpersuasive.

In <u>DeLuca</u> and <u>Pulliam,</u> police officers unlawfully detained passengers in a

vehicle after a lawful traffic stop.  <u>Pulliam</u>, 405 F.3d at 785; <u>DeLuca</u>, 269 F.3d at 1131.

Neither passenger had a possessory or property interest in the vehicle.  <u>Pulliam</u>, 405

F.3d at 786; <u>DeLuca</u>, 269 F.3d at 1132.  The <u>DeLuca</u> and <u>Pulliam</u> courts differentiated

the illegal detentions of (1) the driver; (2) passenger; and (3) the vehicle itself.

<u>Pulliam</u>, 405 F.3d at 789; <u>DeLuca</u>, 269 F.3d at 1132-33.  The Ninth Circuit panel

explained, "[w]e may not amalgamate the *separate police actions* of detaining the car,

detaining each of its occupants, and searching the car, merely because they occurred

in close proximity."  <u>Pulliam</u>, 405 F.3d at 789 (emphasis added).  The courts held that

each occupant of a vehicle must demonstrate that the police would not have

discovered the evidence but for their *own* illegal detention.  <u>Pulliam</u>, 405 F.3d at 787;

<u>DeLuca</u>, 269 F.3d at 1132.  Both courts denied the passengers' motions to suppress

---

[30]  The Sixth Circuit also applies a heightened factual nexus test.  <u>See</u>, <u>United States. v. Carter</u>, 14 F.3d 1150, 1153-55 (6th Cir. 1994).

[31]The Fifth Circuit implicitly rejected the heightened factual test in <u>United States v. Jones</u>, 234 F.3d 234, (5th Cir. 2000).  In <u>Jones</u>, a police officer illegally detained the driver and passenger of a vehicle without reasonable suspicion or probable cause after effectuating the purpose of the lawful traffic stop.  234 F.3d at 241-43.  The Fifth Circuit suppressed evidence discovered in the vehicle as the fruit of the unlawful seizure of the driver and passenger.  <u>Id.</u> at 233-44.  The <u>Jones</u> court did not require the passenger—who had no possessory or property interest in the vehicle—to demonstrate that but for his *own* illegal detention, the evidence would not have been discovered in the vehicle.  <u>Id.</u> at 233-44.

finding the passengers' presence irrelevant to the subsequent discovery of evidence in the vehicle. <u>Pulliam</u>, 405 F.3d at 787; <u>DeLuca</u>, 269 F.3d at 1132.

The Ninth Circuit panel employed a hypothetical to illustrate its reasoning:

> [A]ssume that [the passenger] never got into the car with [the driver], but instead walked off on his own while [the driver] drove away with the gun in the car. Imagine further that the officers stopped the car, found the gun, learned that it belonged to [the passenger], and then went to [the passenger's] home and illegally detained him. In this hypothetical situation, the gun's discovery is not the product of [the passenger's] illegal detention, since the gun was found before the detention even occurred. To say that the gun would have been found even if he had not been detained is merely to recognize that the illegality, on its own, is not a sufficient or even a contributing cause of the gun's discovery. The gun would thus be admissible without any consideration of an "exception" to the exclusionary rule.

<u>Pulliam</u>, 405 F.3d at 791. The Ninth Circuit stated that the passenger could have demonstrated a factual nexus between his own illegal detention and the subsequent discovery of evidence in a vehicle by showing: (1) if he had requested permission to leave the scene (in the vehicle) he would have been able to do so; or (2) his statements or evidence found on his person prompted the search of the vehicle. <u>Id.</u> at 787.

## 2. **"Primary Illegality" Approach**

The dissenting judges in <u>Pulliam</u> and <u>DeLuca</u> flatly rejected the heightened factual test.[32] <u>See</u> <u>Pulliam</u>, 405 F.3d at 791-796 (Wardlaw, J., dissenting); <u>DeLuca</u>, 269 F.3d at 1135-1149 (Seymour, J., dissenting). The <u>Pulliam</u> and <u>DeLuca</u> dissenting

---

[32] A respected Fourth Amendment treatise also rejects the heightened factual nexus test. <u>See</u> Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4(d), at 313–15 (4th ed. 2011).

judges asserted that, for purposes of the fruit of the poisonous tree analysis, courts "must focus on the detention of the vehicle and its occupants as the 'primary illegality,' for they all stemmed from the officers' *single decision* to detain and search the car."  Pulliam, 405 F.3d at 794 (Wardlaw J., dissenting) (emphasis added).  See DeLuca, 269 F.3d at 1146 (Seymour J., dissenting).  More precisely, the dissenting judges view "[t]he detention of the vehicle and the detention of its occupants [as] part of a single, integrated instance of unconstitutional police conduct."  405 F.3d at 794 (Wardlaw J., dissenting).  The Pulliam and DeLuca dissents refused to separate the detention of the (1) driver; (2) passenger; and (3) the vehicle into independent, discrete, police actions.  Rather, the Pulliam and DeLuca dissenting judges found that the unlawful continued detention after a lawful traffic stop is one constitutional violation with multiple victims.

### 3.    <u>Mosley Redux</u>

In Mosley, the Third Circuit explicitly, albeit in dicta, declared: "We will not be overly coy, though: we recognize that the rationale for our holding might be thought to undermine the DeLuca rationale even on DeLuca facts."  454 F.3d at 255-56 n.11.  The Mosley court found that a traffic stop is a "single act, which affects equally all occupants of a vehicle" comporting "with the commonsense experience of everyone who has ever ridden in a car."  Id. at 267.  Hence, the Third Circuit incontrovertibly rejected the heightened factual nexus test.  Mosley, 454 F.3d at 267.

The <u>Mosley</u> court fully appreciated that the seizure of the driver and the vehicle is likely the only "but for" cause of the discovery of evidence in the vehicle. <u>Id.</u> at 258-59. In the vast majority of cases, the presence of the passenger is simply irrelevant to the subsequent discovery of evidence. Nonetheless, the Third Circuit panel refused to distinguish the passenger from the driver. <u>Mosley</u>'s commonsense reasoning applies with equal vigor to cases involving passengers, such as defendant Fraguela, who are illegally detained after a lawful traffic stop. In <u>Mosley</u>, the Third Circuit panel reaffirmed that the application of the exclusionary rule "is grounded in, the continuing exercise of *pragmatic* judicial supervision of the law enforcement activities of the executive branch." <u>Id.</u> (emphasis added). As Judge Wardlaw aptly noted in his <u>Pulliam</u> dissent, unlawfully detaining a vehicle after a lawful traffic stop "still significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." <u>Pulliam</u>, 405 F.3d at 793 (Wardlaw, J., dissenting) (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 436–37 (1984). Practical difficulties such as limited information and time constraints prevent law enforcement officers from differentiating the driver from the passenger prior to expanding the scope of their inquiry beyond the reason for the traffic stop (i.e. initiating a <u>Terry</u> investigatory detention). Thus, officers usually must make a *single*, simultaneous, decision to conduct an investigatory detention.

Indeed, in the instant action the totality of the record establishes that Corporal DeLeon made a *single* decision to detain Almaguer, Fraguela, and the tractor-trailer. Both Fraguela and Almaguer contributed to Corporal DeLeon's reasonable

suspicion.  <u>See</u> <u>supra</u> Section III.B.  At the suppression hearing, Corporal DeLeon

made clear that he continued to detain *both* Almaguer and Fraguela because of "all

things going on" with the stop.  (Dec. Hr'g Tr. at 34, 36).  To separate Corporal

DeLeon's single decision to detain the vehicle and its occupants into three discrete,

independent, detentions misrepresents what actually occurred in the instant matter.

When the record squarely demonstrates that the officer made a *single*

unconstitutional decision to unlawfully detain all occupants of the vehicle after an

lawful traffic stop, <u>Mosley</u>'s reasoning is directly applicable.  There is "a single act,

which affects equally all occupants of a vehicle."  <u>Mosley</u>, 454 F.3d at 267.

For these reasons, the court rejects the heightened factual nexus test used in

<u>Pulliam</u> and <u>DeLuca</u>.  The court concludes that both Almaguer and Fraguela have

adequately demonstrated a casual connection between the "primary

illegality"—Corporal DeLeon's single decision to unlawfully detain them without

probable cause beyond the limits prescribed in <u>Terry</u>—and the discovery of evidence

in the trailer and their subsequent oral and written statements to law enforcement.

### 5.    <u>Exceptions to the Exclusionary Rule</u>

The United States has not argued in its briefs or at either of the evidentiary

hearings that any of the traditional exceptions to the fruit of the poisonous tree

doctrine, such as attenuation, inevitable discovery, or independent source, are

applicable.[33]  Mosley, 454 F.3d at 267 (noting that the government must establish the

traditional exceptions to Wong Sun).  Therefore, the court finds that these arguments

are waived absent a showing of good cause pursuant to Rule 12 of the Federal Rules

of Criminal Procedure.  United States v. Rose, 538 F.3d 175, 182 (3d Cir. 2008).

Accordingly, the motion to suppress evidence will be granted.

## IV.    Conclusion

The court cannot abdicate its role in enforcing constitutional safeguards in

deference to legitimate law enforcement objectives.  As the Supreme Court duly

observed, "[t]he needs of law enforcement stand in constant tension with the

---

[33]  Consent following an illegal seizure can purge the taint of the illegality for Fourth Amendment purposes; the United States "must show sufficient attenuation to causally disconnect the consent from the seizure."  Mosley, 454 F.3d at 261 n.19. To determine whether consent purged the taint of the illegality for Fourth Amendment purposes, courts consider a number of factors including: (1) the temporal proximity between consent to search and the Fourth Amendment violation; (2) the existence of intervening circumstances; and (3) the purpose and flagrancy of the officer's misconduct.  Brown v. Illinois, 422 U.S. 590, 603 (1975); United States v. Gordon, No. 10-CR-0001, 2010 WL 1711998 (D. Virgin Islands Apr. 27, 2010).
    Assuming *arguendo* that the United States did not waive the attenuation exception to the Wong Sun rule, the court would nonetheless suppress the evidence.  Almaguer orally consented to a search of his "truck" at 12:59 p.m., ninety-four minutes after the initial stop and in the midst of a *de facto* arrest.  (See Vid. R. at 12:59).  Corporal DeLeon then provided Almaguer with a preprinted written consent form.  (Id. at 12:59-1:03).  Presumably, had the United States raised the issue, it would have asserted that the written consent form purged the taint of illegality for Fourth Amendment purposes.  The court concludes that the written consent form fails to demonstrate sufficient attenuation to casually disconnect the consent from the *de facto* arrest.  The inherently coercive nature of an hour and thirty-four minute detention irreversibly taints a subsequent consent to search. Under the circumstances, Almaguer experienced immense pressure to fully cooperate with Corporal DeLeon in order to terminate the seemingly interminable stop.

Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." <u>Almeida-Sanchez v. United States</u>, 413 U.S. 266, 273 (1973). Based on the forgoing discussion, the court finds that the length and scope of the Corporal DeLeon's traffic stop and subsequent investigatory detention constituted a *de facto* arrest without probable cause. The motion to suppress evidence is therefore granted.

An appropriate order follows.

<u>  S/ Christopher C. Conner   </u>
CHRISTOPHER C. CONNER
United States District Judge

Dated:     March 12, 2012

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **UNITED STATES** | : | **CRIMINAL NO. 1:10-CR-0330** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **ALCIDE FRAGUELA-CASANOVA** | : | |
| **and JUAN CARLOS ALMAGUER** | : | |
| | : | |
| **Defendants** | : | |


## <u>ORDER</u>

AND NOW, this 12th day of March, 2012, upon consideration of the motion

(Doc. 61) to suppress filed by defendants Alcide Fraguela-Casanova and Juan Carlos

Almaguer, and for the reasons stated in the accompanying memorandum it is hereby

ORDERED that the motion (Doc. 61) to suppress is GRANTED.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge